**R. Sonya SANDOE and John Sandoe, Appellants,**

v.

**LEFTA ASSOCIATES and Norair Engineering Corp., Appellees.**

**LEFTA ASSOCIATES, Cross–Appellant,**

v.

**NORAIR ENGINEERING CORP., Appellee.**

**Nos. 86–1506, 87–149.**

District of Columbia Court of Appeals.

Argued Feb. 2, 1988.

Decided Dec. 5, 1988.

Maurice R. Dunie, with whom Patricia E. Connelly, Bethesda, Md., was on the brief, for appellants.

Walter J. Murphy, Jr., Wheaton, Md., for appellee/cross-appellant Lefta Associates.

Thomas M. Hogan, Washington, D.C., for appellee Norair Engineering Corp.

Before ROGERS, Chief Judge,[*] and MACK and STEADMAN, Associate Judges.

ROGERS, Chief Judge:

These consolidated appeals raise two principal issues: the constitutionality of the District's statute of repose, D.C.Code § 12–310 (1981), and the sufficiency of the jury instructions on the standard of care that is owed by a landowner to a person lawfully on the premises. Appellants R. Sonya Sandoe and John Sandoe and appellee/cross-appellant Lefta Associates contend that the statute violates due process and equal protection because its distinction between construction professionals and owners and occupiers of land is an arbitrary classification that is not rationally related to furthering a legitimate governmental purpose. The Sandoes also contend that the trial judge erred in refusing to instruct the jury that a landowner has a duty to persons lawfully on the premises to inspect the property for latent, dangerous defects. We hold that § 12–310 is constitutional. We further hold that the trial judge's instructions did not adequately inform the jury of the factors to be considered in determining whether or not Lefta breached its duty of reasonable care to Mrs. Sandoe. Accordingly, we reverse and remand for a new trial.

[*] Judge Rogers was an Associate Judge of this court at the time of argument. Her status changed to Chief Judge on November 1, 1988.

## I

R. Sonya Sandoe and John Sandoe sued Lefta Associates ("Lefta"), appellee/cross-appellant, a partnership that owns the Embassy Square Hotel at 22nd and N Streets, N.W., and Norair Engineering Corp. ("Norair"), appellee, the general contractor and builder of the hotel, for damages resulting from personal injuries suffered by Mrs. Sandoe while she was making a routine pest inspection of the hotel at the owner's request. Her injuries occurred when she stepped on an airshaft grate which collapsed, causing her to fall thirty feet. The complaint alleged negligent construction and maintenance of the grate by Lefta and Norair. Lefta filed a cross-claim against Norair for indemnification and contribution.[1]

In November, 1983, Judge Hannon granted Norair's motion for summary judgment on the ground that the Sandoes' cause of action was barred by the District of Columbia's statute of repose, D.C.Code § 12–310 (1981),[2] because Mrs. Sandoe's injury occurred more than ten years from the date that the hotel was substantially completed. A jury trial of the Sandoes' claims against Lefta, the only remaining defendant, resulted in a verdict in favor of Lefta. The Sandoes' motion for a new trial was denied.

Most of the relevant facts are not in dispute.[3] At the time of her fall, Mrs. Sandoe was a licensed exterminator with Town and Country Exterminating Company, which was owned by the Sandoes. Lefta had hired Town and Country because of a serious rat infestation problem at the hotel. On September 20, 1979, Mrs. Sandoe went to the hotel to assist her son with the rat extermination problem, which he had been unable to resolve. After inspecting interior portions of the building, Mrs. Sandoe began inspecting the hotel's outside perimeter for rat burrows.

Around the perimeter of the hotel are a series of airshafts that serve the hotel's underground garage. Each shaft is equipped at the bottom with a fan, and each shaft is covered with a metal grate. Mrs. Sandoe walked over several of the grates without incident. One grate, how-

---

1. In an amended complaint, the Sandoes added claims against Elliot Gitlin and Marvin Cantor, the architects for the building, and Potomac Ironworks, Inc., a subcontractor. Lefta also filed cross-claims against Gitlin and Cantor. The claims against Gitlin and Cantor were dismissed on summary judgment in January, 1983, and the Sandoes noted an appeal from these rulings. Pursuant to an agreement between the parties, this court dismissed these appeals in 1987. Potomac Ironworks, Inc., was voluntarily dismissed in 1983 after it initiated bankruptcy proceedings. Thus, the claims against Gitlin, Cantor and Potomac Ironworks, Inc., are not part of these appeals.

2. D.C.Code § 12–310 (1981) provides in pertinent part:

   (a)(1) Except as provided in subsection (b), any action—
   (A) to recover damages for—
   (i) personal injury

   .    .    .    .    .

   resulting from the defective or unsafe condition of an improvement to real property, and
   (B) for contribution or indemnity which is brought as a result of such injury or death, shall be barred unless in the case where injury is the basis of such action, such injury occurs within the ten-year period beginning on the date the improvement was substantially completed ...

   (2) For purposes of this subsection, an improvement to real property shall be considered substantially completed when—
   (A) it is first used, or
   (B) it is first available for use after having been completed in accordance with the contract or agreement covering the improvement, including any agreed changes to the contract or agreement, whichever first occurs.
   (b) The limitation of actions prescribed in subsection (a) shall not apply to—
   (1) any action based on a contract, express or implied, or
   (2) any action brought against the person who, at the time the defective or unsafe condition of the improvement to real property caused injury or death, was the owner of or in actual possession or control of such property.
   Section 12–310(b) was recently amended to add exemptions for "any manufacturer or supplier or any equipment or machinery or other articles installed in a structure upon real property" and "any action brought by the District of Columbia government." *Id.* § 12–310(b)(3), (4) (1988 Supp.).

3. The parties stipulated that for purposes of this appeal, they will rely, with minor exceptions, on the facts as set forth in Judge von Kann's Memorandum Opinion denying the Sandoes' motion for a new trial. *See Sandoe v. Lefta Assocs.*, 114 Daily Wash.L.Rptr. 2389 (November 18, 1986).

ever, gave way when she stepped on it, and she fell thirty feet to the concrete bottom of one of the shafts. An angle iron which was supposed to support the grate was missing, so that when Mrs. Sandoe stepped on the grate, it immediately collapsed. Mrs. Sandoe sustained serious physical injuries as a result of the fall which produced great pain and suffering, significant disability, large medical bills, and resulted in a loss of consortium for her husband.

The main issue at trial was determining who was responsible for the absence of the angle iron. Frank Peters, Norair's general superintendent during construction of the hotel, testified that, to the best of his knowledge, all of the angle irons were installed in all of the shafts when Lefta assumed control of the building. He believed that damage to a bolt removed from one of the angle irons was caused by the raising and lowering of a covering grate, presumably by Lefta's employees after the building was constructed. The shafts and fans were designed to be serviced by removing the grate and lowering a ladder down into the shaft. Since a grill was welded over the interior side of each fan, it would be difficult to service the fan and clean the shaft's drainage hole from inside the garage. Peters also indicated that, because of financing commitments, there was great urgency to complete construction of the hotel. Lacking the proper tool to install the angle irons with anchor bolts as contemplated in the architects' plans, Peters directed, without the architects' approval, that the angle irons be secured by using a "ram set" gun, which he contended was an acceptable alternative.

Peters' testimony was disputed by two expert witnesses. Elliot Gitlin, one of the hotel's architects, testified that the plans he approved required the angle iron to be bolted with 3/8 inch diameter anchor bolts. A ram set gun would not have been a suitable alternative to fasten these bolts since the ram set nail is at most 1/8 of an inch in diameter and is likely to fracture the masonry wall when installed. Edgar Seaquist, a licensed consulting engineer hired by Lefta to investigate the accident, testified that the ram set method would be completely inadequate. He stated, however, that he had carefully inspected the wall of the subject shaft and found no evidence of ram set holes or any other indication that an angle iron had ever been affixed to this wall. This testimony was corroborated by Richard Tate, Lefta's chief of maintenance, who said that he inspected all of the ventilation shafts after Mrs. Sandoe's fall and found that two of the shafts were missing angle irons.

There was additional testimony about why this unsafe condition was not detected and corrected during the eleven years between the completion of construction and Mrs. Sandoe's accident. Mr. Gitlin testified that he conducted a "walk around" inspection of the premises before the building was turned over to Lefta. However, he did not inspect such detailed matters as the installation of angle irons and grates because he assumed that the general contractor had properly carried out the installation in accordance with the plans approved by the architects. Gitlin also testified, without contradiction, that the District of Columbia building and safety inspectors who inspected the building prior to issuing the certificate of occupancy also probably overlooked the missing angle irons.

Mr. Tate testified that there was no occasion for Lefta to remove the grates over the ventilation shafts because the shafts were cleaned, and the fans maintained, from inside the garage. Although the grills over the fans were originally welded in place, the welds were later broken so that the grillwork could be removed easily. Approximately once a month, Lefta employees open the grillwork and perform any necessary maintenance work the fans may need. To clean the drains at the bottom of the shafts, a long rod with a scoop on the end is extended through the grill from inside the garage into the shaft to remove any materials in the drain. Adolph Ratulangi, the hotel's assistant manager, verified that the airshafts were cleaned from within the garage by use of such a rod. Since the hotel did not have a ladder long enough to reach the bottom of the thirty-foot shafts, he believed that no em-

ployee had ever entered the shaft from the top grate. As far as he knew, no Lefta employee had inspected the grate that had collapsed under Mrs. Sandoe because without notice of any problem with the grates there was no reason to make such inspections. After all of the testimony was received, the jurors were taken to the hotel to view the site.

## II

■ The Sandoes and Lefta contend that D.C.Code § 12–310 violates the due process and equal protection clauses of the fifth amendment of the United States constitution because the statute's distinction between construction professionals, who are accorded protection under the statute, and owners and occupiers of land, who are not, is an arbitrary classification scheme not rationally related to furthering a legitimate governmental interest.[4] The Sandoes concede that § 12–310 does not implicate either a fundamental right or a suspect class. Thus, the statute must be examined under the rational basis standard and upheld as constitutional if the classification it creates is rationally related to a legitimate state purpose. *Western & Southern Life Ins. Co. v. State Bd. of Equalization,* 451 U.S. 648, 657, 101 S.Ct. 2070, 2077, 68 L.Ed.2d 514 (1981); *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 314, 96 S.Ct. 2562, 2567, 49 L.Ed. 2d 520 (1976). A particular statutory classification scheme will not be set aside "if any set of facts reasonably may be con-

ceived to justify it." *McGowan v. Maryland,* 366 U.S. 420, 425–26, 81 S.Ct. 1101, 1104–05, 6 L.Ed.2d 393 (1961). Because we find such justification we hold that § 12–310 is constitutional.

■ As the Sandoes recognize, nearly every federal court which has considered the constitutionality of statutes of repose[5] like § 12–310, including two federal district courts construing D.C.Code § 12–310, have upheld their constitutionality. *See Hartford Fire Ins. Co. v. Lawrence, Dykes, Goodenberger, Bower & Clancy,* 740 F.2d 1362 (6th Cir.1984); *Britt v. Schindler Elevator Corp.,* 637 F.Supp. 734 (D.D.C.1986); *President and Directors of Georgetown College v. Madden,* 505 F.Supp. 557 (D.Md. 1980), *aff'd,* 660 F.2d 91 (4th Cir.1981). *But see McClanahan, supra* note 4, 494 F.Supp. 1334. In addition, a clear majority of state courts have also concluded that these statutes do not present federal constitutional problem. *See, e.g., Regents of the Univ. of Calif. v. Hartford Accident & Indem. Co.,* 59 Cal.App.3d 675, 131 Cal. Rptr. 112 (1976); *Rosenberg v. Town of North Bergen,* 61 N.J. 190, 293 A.2d 662 (1972); *Freezer Storage, Inc. v. Armstrong Cork Co.,* 234 Pa.Super. 441, 341 A.2d 184 (1975), *aff'd,* 476 Pa. 270, 382 A.2d 715 (1978); *Yakima Fruit & Cold Storage Co. v. Central Heating & Plumbing Co.,* 81 Wash.2d 528, 503 P.2d 108 (1972). A number of state courts that have held statutes of repose unconstitutional have done so on the basis of violations of their state

---

**4.** As a threshold matter, Norair contests the Sandoes' standing to challenge the constitutionality of D.C.Code § 12–310. *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). We hold, first, that the Sandoes have alleged an "injury in fact"; that is, they have a sufficiently concrete interest in the outcome of their suit to make it a case or controversy since they have suffered significant damages and stand to lose any rights against Norair by the operation of § 12–310. We hold, second, that "as a prudential matter, [they] are proper proponents of the particular legal rights on which they base their suit." *Id.* at 112, 96 S.Ct. at 2873. Although the Sandoes actually seek to assert the rights of Lefta, we are satisfied that the intensity of the Sandoes' interest in the outcome of their constitutional challenge is sufficient to assure that they are appropriate proponents of these claims. *Id.* at 115–16, 96 S.Ct. at 2874–75;

*McClanahan v. American Gilsonite Co.,* 494 F.Supp. 1334, 1343 (D.Colo.1980). We also note that it is not without significance that Lefta joins the Sandoes in their constitutional contention.

**5.** Section 12–310 is a statute of repose, not a statute of limitations. A statute of limitations prescribes a period of time within which legal proceedings must be initiated after the cause of action accrues. A statute of repose, on the other hand, establishes an absolute time period within which legal proceedings must be initiated, regardless of when a cause of action accrues. *Klein v. Catalano,* 386 Mass. 701, 702, 437 N.E.2d 514, 516 (1982) ("The injury need not have occurred, much less have been discovered.").

constitutions. *See, e.g., Bagby Elevator & Elec. Co. v. McBride*, 292 Ala. 191, 291 So.2d 306 (1974); *Overland Constr. Co. v. Sirmons*, 369 So.2d 572 (Fla.1979); *Tabler v. Wallace*, 704 S.W.2d 179 (Ky.), *cert. denied*, 479 U.S. 822, 107 S.Ct. 89, 93 L.Ed.2d 41 (1986); *Daugaard v. Baltic Co-op Bldg. Supply Ass'n*, 349 N.W.2d 419 (S.D.1984). Moreover, on three occasions the United States Supreme Court has dismissed appeals based on constitutional challenges to statutes of repose on the grounds that no substantial federal question was presented. *See Carter v. Hartenstein*, 248 Ark. 1172, 455 S.W.2d 918 (1970), *appeal dismissed*, 401 U.S. 901, 91 S.Ct. 868, 27 L.Ed.2d 800 (1971); *Woodward v. Burnham City Hosp.*, 79 Ill.2d 295, 37 Ill.Dec. 558, 402 N.E.2d 560 (1979), *appeal dismissed*, 449 U.S. 807, 101 S.Ct. 54, 66 L.Ed.2d 11 (1980); *Ellerbe v. Otis Elevator Co.*, 618 S.W.2d 870 (Tex.Civ.App.1981), *appeal dismissed*, 459 U.S. 802, 103 S.Ct. 24, 74 L.Ed.2d 39 (1982).

The legislative history of § 12–310 supports the conclusion that the statute rationally advances a legitimate state objective. The Senate Report accompanying S. 1524, the bill that became § 12–310, stated:

> The purpose of this legislation is to provide a 10–year limitation of actions arising out of death or injury caused by defective or unsafe improvements to real property.... Under existing law, there is no limitation on the period of time during which an action may be brought in the District of Columbia against design professionals on the basis of a defective or unsafe improvement to real property.... Since 1961, over 40 States have enacted statutes prescribing limitations of actions arising out of death or injuries caused by unsafe or defective improvements to real property. *The purpose of these limitations is not to bar seasonable and timely actions. Rather, to require that justifiable controversies be brought while the evidence is still fresh and available.* Architects who design buildings or improvements to real property, engineers who design and install equipment, or contractors, who build the improvements under rigid inspection and conformity with building codes, may find themselves named as defendants in such damage suits 20 years after the improvement was completed and occupied. Moreover, architects, engineers, and contractors have no control over an owner whose neglect in maintaining an improvement may cause dangerous or unsafe conditions to develop over a period of years. They cannot prevent an owner from using an improvement for purposes for which it was not designed. Nor can they prevent the owner of a building from making alterations or changes which may, years afterward, be determined unsafe or defective and appear to be a part of the original improvement. Can it be doubted that to allow actions without regard to a reasonable time limitation imposes a difficult evidentiary burden on design professionals and their progenies? *This proposed legislation strikes the balance between the rights of injured parties to seek recovery on the one hand, and the substantial interest of the design professionals to have finality to their work on the other.* After a considerable amount of examination of the interests of both design professionals and consumers, we believe that as a matter of sound policy and fairness, a 10–year limit should be established within which actions against design professionals must be brought.

S. REP. No. 92–1274, 92d Cong., 2d Sess. 1–2 (1972) (emphasis added). There was considerable testimony before House and Senate subcommittees concerning the need for reasonably limiting the duration of liability of design professionals while at the same time protecting the rights of consumers to bring timely actions. *See, e.g., Hearing Before the Subcomm. on Business, Commerce and Judiciary of the Senate Comm. on the District of Columbia*, 92d Cong., 2d Sess. (1972); *Hearing Before Subcomm. No. 1 of the House Comm. on the District of Columbia*, 90th Cong., 1st Sess. (1967). One study revealed that 99.6% of all claims against architects were brought within ten years after the building

was completed. *Id.* at 28. *But see Hearing Before the Subcomm. on Business, Commerce and Judiciary of the Senate Comm. on the District of Columbia,* 92d Cong., 2d Sess. 7 (1972) (remedy should be provided for injury without time limitation, but if there is to be a time limitation it should be longer than five years, as proposed in the bill, noting that Maryland's statute of repose was twenty years) (statement of Ted D. Kuemmerling, Office of the Corporation Counsel, District of Columbia).

Considering the legislative record as a whole and our limited standard of review, we hold that § 12–310 rests on reasonable grounds and does not violate the due process and equal protection clauses of the fifth amendment of the U.S. Constitution. *See Britt, supra,* 637 F.Supp. at 737; *President and Directors of Georgetown College, supra,* 505 F.Supp. at 580.

### III

The Sandoes also contend that the trial judge erred in failing to instruct the jury that Lefta, as an owner and occupier of land, owed to Mrs. Sandoe, a person lawfully on the hotel's premises, an affirmative duty to inspect the property for latent, dangerous defects. Based on case law in this jurisdiction which had abolished the traditional common law distinction between licensees and invitees, the trial judge declined to give the Sandoes' requested instruction and instead instructed the jury that the applicable standard of care was that of reasonable care under the circumstances. The Sandoes argue that the abolition of the common law classifications was not intended to eliminate the landowner's duty to make the premises reasonably safe for persons lawfully on the premises by inspecting for latent defects, and therefore the trial judge's instruction, as well as the standardized jury instruction upon which it was based, did not adequately inform the jury of the proper standard of care.

■ In the District of Columbia the applicable standard for determining whether an owner or occupier of land has exercised the proper level of care to a person lawfully upon his premises is reasonable care

under all of the circumstances. *Holland v. Baltimore & Ohio R.R. Co.,* 431 A.2d 597, 599 (D.C.1981) (en banc); *Blumenthal v. Cairo Hotel Corp.,* 256 A.2d 400, 402 (D.C. 1969) ("this jurisdiction does not recognize varying standards of care depending upon the relationship of the parties but always requires reasonable care to be exercised under all the circumstances"); *District of Columbia Transit Sys., Inc. v. Carney,* 254 A.2d 402, 403 (D.C.1969) ("there are no categories of care ... the care required is always reasonable care"); *see District of Columbia v. Mitchell,* 533 A.2d 629, 639 (D.C.1987); *Sinai v. Polinger Co.,* 498 A.2d 520, 529–30 & nn. 15 & 16 (D.C.1985); *Morgan v. District of Columbia,* 449 A.2d 1102, 1109 (D.C.1982); *Washington Metropolitan Area Transit Auth. v. Ward,* 433 A.2d 1072, 1074 (D.C.1981) (Ferren, J., concurring); *Morrison v. MacNamara,* 407 A.2d 555, 560 (D.C.1979); *Matthews v. District of Columbia,* 387 A.2d 731, 734 (D.C. 1978). *See also Smith v. Arbaugh's Restaurant, Inc.,* 152 U.S.App.D.C. 86, 89, 469 F.2d 97, 100 (1972). In *Holland v. Baltimore & O.R. Co, supra,* 431 A.2d 597, the en banc court acknowledged that the District of Columbia had joined in the prevailing movement among other jurisdictions in abolishing the common law distinctions between invitees and licensees and adopting a reasonable care standard as to persons lawfully upon the premises. *Id.* at 597 (citing *Blumenthal v. Cairo Hotel Corp., supra,* 256 A.2d at 402; *District of Columbia Transit Sys., Inc. v. Carney, supra,* 254 A.2d at 403).

While *Holland* expressly reaffirmed this jurisdiction's abolition of the traditional classifications of invitee and licensee, neither it nor our previous decisions provided the rationale for abandoning these distinctions. In *Holland,* a nine-year-old child was injured by a train while trespassing on the unprotected tracks of two railroads. *Id.* at 598. The trial court had granted summary judgment in favor of the railroads relying on *Firfer v. United States,* 93 U.S.App.D.C. 216, 208 F.2d 524 (1953), which had adopted the strict common law standard that trespassers may recover only in cases of "intentional, wanton, or willful

injury." *Id.* at 220, 208 F.2d at 528. On appeal, the plaintiff in *Holland* argued that the less stringent standard of *Smith v. Arbaugh's Restaurant, Inc., supra,* should have applied. In *Arbaugh's,* the United States Court of Appeals for the District of Columbia Circuit stated that the common law distinctions between trespassers, licensees and invitees were "alien to modern tort law," and that a single standard of "reasonable care under the circumstances" should be applied regardless of the visitor's status upon the land. *Id.* 152 U.S.App.D.C. at 89, 469 F.2d at 100–01.

*Holland* expressly rejected any reliance upon *Arbaugh's* for deciding the applicable standard of care with respect to trespassers because the plaintiff in *Arbaugh's* was an invitee, thereby rendering *Arbaugh's* inapplicable to trespasser cases.[6] *See Ward, supra,* 433 A.2d at 1074 ("We declined in *Holland* to follow the D.C. Circuit's decision in *Arbaugh's ... insofar as it extended this reasonable care standard to trespassers.*") (emphasis added). Although we have no occasion to reexamine *Holland's* rejection of *Arbaugh's* holding with respect to trespassers,[7] *Arbaugh's* is instructive here because it sets forth both the rationale for abolishing the common law distinction between invitees and licensees and the factors to be weighed by the jury to guide its determination of reasonable conduct under the facts and circumstances of each case.

The plaintiff in *Arbaugh's* was a health inspector who was injured when he slipped down a restaurant's stairway during a routine inspection. Noting the "awkwardness of fitting the circumstances of modern life into the rigid common law classifications of trespassers, licensees, and invitees," the United States Court of Appeals decided to abandon these classifications as the sole determinants of liability and instead applied "ordinary principles of negligence to govern a landowner's conduct: A landowner must act as a reasonable man in maintaining his property in a reasonably safe condition in view of all the circumstances." *Arbaugh's, supra,* 152 U.S.App. D.C. 88–89, 469 F.2d at 99–100. The court stated several reasons for eliminating the common law classification system. First, the common law classification system is outdated because it establishes "immunities from liability which no longer comport with accepted values and common experience." *Id.* at 90, 469 F.2d at 101. Second, "questions which involve moral and empirical judgments are best handled by representatives of the community as a whole." *Id.* at 91, 469 F.2d at 102. Third, in order to avoid the harsh and inequitable results often produced by the rigid classification system, courts increasingly had blurred the definitions and exceptions to the categories, making the system nearly impossible for courts and juries to understand and apply. *Id.* at 92–93, 469 F.2d at 103–04.

---

**6.** The court in *Holland* declined the invitation to follow *Arbaugh's* on the grounds that "the issue of the duty of care owed a trespasser by a landowner was not before the [*Arbaugh's*] court," *Holland, supra,* 431 A.2d at 600, and "the circuit court was 'no longer the authoritative expositor of the common law of the District of Columbia.'" *Id.* (quoting *Cooper v. Goodwin,* 155 U.S.App.D.C. 449, 454, 478 F.2d 653, 658 (1973) (Leventhal, J., concurring)); *see M.A.P. v. Ryan,* 285 A.2d 310 (D.C.1971). The *Holland* court rejected the argument that *Arbaugh's* unitary standard of reasonable care under the circumstances should apply to trespassers, and instead, relying upon *Firfer, supra,* 93 U.S.App. D.C. 216, 208 F.2d 524, held that "[i]n this jurisdiction, trespassers may, generally speaking, only recover from landowners for injuries that were willful, wanton, or that resulted from maintenance of a hidden engine of destruction." *Holland, supra,* 431 A.2d at 601.

**7.** [T]he considerations governing a landowner's or occupant's liability to trespassers may be fundamentally different from his duty to those whom he has expressly or by implication invited onto his property. Burglars are trespassers; vandals are trespassers. We have criminal statutes governing trespassers. Sweeping away all distinction between trespassers and social guests and business invitees is a drastic step to take because there may be, and often is, good reason to distinguish between a trespasser and a social guest. There is little or no reason to distinguish between a social guest and a business invitee.

*Peterson v. Balach,* 294 Minn. 161, 199 N.W.2d 639, 642 (1972) (citation omitted); *see* F. HARPER, F. JAMES & O. GRAY, THE LAW OF TORTS § 27.1, at 133 n. 19 (2d ed. 1986) (citing jurisdictions that have abandoned the distinction between invitees and licensees but have retained a distinction as to trespassers) [HARPER & JAMES].

Having established the rationale for eliminating the common law distinctions, the *Arbaugh's* court identified the factors to be weighed by the jury to guide its determination of reasonable conduct under all of the circumstances:

> Eliminating reliance on the common law classifications does not leave the jury awash, without standards to guide its determination of reasonable conduct. The principles which are now to be applied are those which have always governed personal negligence under our jurisprudence. The factors to be weighed in the determination of the degree of care demanded in a specific situation are *"the likelihood that [the landowner's] conduct will injure others, taken with the seriousness of the injury if it happens, and balanced against the interest which [the landowner] must sacrifice to avoid the risk,"* Conway v. O'Brien, 111 F.2d 611, 612 (2d Cir.1940) (L. Hand, J.), and the jury should be so instructed. Thus, we do not hold that landowners are now insurers of their property, or that they must endure unreasonable burdens to maintain it. We do hold that the status of an entrant onto the property is not *solely* determinative of the duty of care owed him. Of course, the circumstances of the visitor's entry have some relation to the question of landowner liability. Foreseeability of the visitor's presence determines in part the likelihood of injury to him, and the extent of the interest which must be sacrificed to avoid the risk of injury.[8]

*Arbaugh's, supra,* 152 U.S.App.D.C. at 94–95, 469 F.2d at 105–06 (emphasis added).

*Arbaugh's* quoted language from *Seganish v. District of Columbia Safety Stores, Inc.,* 132 U.S.App.D.C. 117, 406 F.2d 653

(1968), and *Daisey v. Colonial Parking, Inc., supra* note 8, 118 U.S.App.D.C. 31, 331 F.2d 777, as providing one model of a jury instruction with respect to a landowner's duty to persons lawfully on the premises:

> A *[landowner]* is not an insurer of the condition of his [property]. His duty is to exercise reasonable care to keep [his property] safe [in view of the foreseeability of the presence of others on his land]. He is responsible, of course, for injuries resulting from risks created personally or by his employees. Moreover, his *obligation of due care extends to reasonable supervision and inspection of the premises to identify and protect against potential perils* [in view of the probability of injury to others]. For this reason, liability may also spring from a negligent failure to safeguard against dangers born of the activities of [others]. But negligence can be found in relation to a [visitor]-created hazard only if it is known, or because of its duration should have been discovered, in time to afford a fair opportunity to remove it.

*Arbaugh's, supra,* 152 U.S.App.D.C. at 95 n. 48, 469 F.2d at 106 n. 48 (emphasis added) (quoting *Seganish, supra,* 132 U.S. App.D.C. at 119–20, 406 F.2d at 655–56). The court noted that the standard of reasonable care under the circumstances would afford a jury that is informed of the appropriate factors recited above sufficient flexibility to avoid the undue harshness commonplace under the old classification scheme. *Id.* 152 U.S.App.D.C. at 95, 469 F.2d at 106.

In the instant case the trial judge declined to include any portion of the San-

---

8. *Arbaugh's* also pointed out that:

> The jury should also be charged that landowners are not expected to "assume burdens of care which are unreasonable in the light of the relative expense and difficulty to them as weighed against the probability and seriousness of the foreseeable harm to others."

*Arbaugh's, supra,* 152 U.S.App.D.C. at 95 n. 49, 469 F.2d at 106 n. 49 (quoting *Daisey v. Colonial Parking, Inc.,* 118 U.S.App.D.C. 31, 34, 331 F.2d 777, 780 (1963). *See also* Standardized Civil

Jury Instructions for the District of Columbia, No. 10–1A (1981), for use in proceedings in the United States District Court for the District of Columbia. *See* Standardized Civil Jury Instructions for the District of Columbia, preface to Chapter X (1981). This instruction was deleted by the 1985 revisions. *See* Standardized Civil Jury Instructions for the District of Columbia, introductory note to Chapter X (1985 Supp.). *See* note 10, *infra.*

does' requested instruction.[9] Instead, he used the newly revised Standardized Instruction No. 10–3,[10] with the following elaboration:

A landowner is not a guarantor of the safety of all persons lawfully upon his premises. Thus a landowner is not liable if one lawfully upon his premises is injured by a dangerous condition which was so hidden, or "latent" as it's sometimes said, that the condition could not have been discovered through the exercise of ordinary care.

On the other hand, a landowner is liable if one lawfully upon his premises is injured by a dangerous condition which, in the exercise of ordinary care, the land-

9. The Sandoes' requested jury instruction read:

You are instructed that the defendant in this case owed a duty to the plaintiff, Mrs. Sandoe, to make the land safe for her entry and for her uses while on the property. The plaintiff is entitled to expect that the property has been inspected in order to discover its actual condition and any latent defects, followed by such repairs, safeguards or warnings as may be reasonably necessary for Mrs. Sandoe's protection under the circumstances.

The condition which existed at the ventilation shaft where Mrs. Sandoe fell was extremely dangerous. If you find that the defendant had actual knowledge of the unsafe condition, or knowledge which should have alerted him to the dangerous condition, then your verdict should be for Mrs. Sandoe.

You are further instructed that *the defendant had a duty to carry out such inspections as a reasonable person would find necessary* to detect or ascertain any dangerous conditions and a further duty to correct promptly any such dangerous conditions or to warn Mrs. Sandoe that they existed.

The reasonableness of the inspections is in direct relation to the extent of the danger to the person on the premises. The more dangerous the condition, the greater the duty of inspection, detection of dangerous conditions and warning.

If you find that the defendant failed to carry out a reasonable inspection program or plan from the time the building was completed until September 20, 1979, taking into consideration the nature of the danger involved, the nature of the building as a hotel, the age of the building, the various providers of services who enter and use the premises and similar factors, then your verdict should be in favor of Mrs. Sandoe.

On the other hand, if you find that the defendant did not have actual knowledge of the dangerous condition that existed and did have a reasonable program or plan of inspection and carried out such inspections of the premises as would be reasonable under the circumstances to detect hidden or latent defects or dangerous conditions, then your verdict should be for the defendant. [Emphasis added]

10. In 1985, due largely to the court's decisions in *Holland* and *Ward, supra,* a committee of the Bar Association of the District of Columbia proposed extensive revisions to Chapter X of the Standardized Civil Jury Instructions to reflect the changes in the law with respect to a landowner's duty of care. Standardized Civil Jury Instructions for the District of Columbia, introductory note to Chapter X (1985 Supp.). Prior to 1985, the standardized instructions provided several different instructions on a landowner's duty of care depending upon the common law classifications of invitee, licensee, guest or trespasser. The instruction to be used for invitees, which would have applied to Mrs. Sandoe under the former classification system, specifically referred to inspection by a landowner, and read in pertinent part:

An invitee is a person who goes upon the land of another for the purpose of carrying on some transaction either for the benefit of himself and the landowner, or for the benefit of the landowner alone. Toward an invitee the owner or occupier of land is obliged to exercise ordinary care to keep the premises in a condition reasonably safe for the invitee and to refrain from active negligence. However, the responsibility with respect to the condition of the premises is not absolute ... *the owner or occupier is not bound to discover defects which a reasonable inspection* would not disclose....

*Id.* No. 10–5 (1981) (emphasis added). The trial judge gave the revised jury instruction, which is applicable to all persons lawfully upon a landowner's premises, and does not specifically refer to inspection by a landowner. It reads in pertinent part:

A person lawfully upon the land is one who goes upon the land of another for the purpose of carrying on some transaction either for the benefit of himself and the landowner, or for the benefit of the landowner alone or one who has been invited upon the land by the landowner or occupier, but not for the benefit of the landowner or occupier ... A landowner owes to a person lawfully upon the land the duty to exercise reasonable and ordinary care under the circumstances to keep the premises reasonably safe and to avoid injuring such person. In addition, he owes him the *duty to repair dangerous conditions which are known to the owner or which are discoverable in the exercise of ordinary care* and which would not be discovered by the person lawfully upon the land....

*Id.* No. 10–3 (1985 Supp.) (emphasis added).

owner should have discovered and either corrected or warned about.

In the end, the question with respect to so-called "latent" or hidden defects on the premises is one of negligence—was the landowner negligent in failing to discover and correct a dangerous condition? [11]

The trial judge distinguished earlier cases in this jurisdiction which had referred to a duty to inspect the public areas of stores to make them safe for invitees, *e.g., Seganish v. District of Columbia Safeway Stores, Inc., supra* note 8, 132 U.S.App.D.C. 117, 406 F.2d 653; *Hellyer v. Sears, Roebuck & Co.,* 62 U.S.App.D.C. 318, 67 F.2d 584 (1933); *The Washington Mkt. Co. v. Clagett,* 19 U.S.App.D.C. 12 (1901), on the ground that they had been decided prior to this court's decisions in *Blumenthal, Carney, Holland* and *Ward, supra,* and therefore described a duty of care based on an outdated common law classification, invitee, that is no longer recognized in this jurisdiction.[12]

The Sandoes argue that the abolition of the common law classifications was not intended to eliminate the landowner's duty to make the premises reasonably safe for persons lawfully on the premises by inspecting for latent defects, and therefore the trial judge's instruction, as well as the standardized jury instruction upon which it was based, did not adequately inform the jury as to the proper standard of care. Under the common law there were two distinct standards of care owed to invitees and licensees: towards invitees, a landowner owed a duty of reasonable care, which included a duty of reasonable inspection, *Seganish, supra,* 132 U.S.App.D.C. at 120, 406 F.2d at 656; *see* Standardized Civil Jury Instructions for the District of Columbia, No. 10–5 (1981), *supra* note 10, while towards licensees, a landowner was merely required to refrain from active negligence. *Firfer, supra,* 93 U.S.App.D.C. at 219, 208

F.2d at 527; *see* Standardized Civil Jury Instructions for the District of Columbia, No. 10–3 (1981), *supra* note 10. The Sandoes argue that one of the main reasons for eliminating the distinction between invitees and licensees was to improve the position of licensees in the eyes of the law, not to lower the position of invitees. Thus, they maintain, if there is now one standard of care for persons lawfully on the premises, then those persons are also entitled to a duty of reasonable inspection—otherwise, the standard of care for persons formerly classified as invitees has been inadvertently lowered.

We agree that the abolition of the common law classifications was not intended to eliminate the landowner's duty to make the premises reasonably safe for persons lawfully on the premises. Accordingly, the trial court erred in not instructing the jury that, in determining whether Lefta had exercised reasonable care, it should consider whether a reasonable inspection of the hotel property by Lefta would have uncovered the defect which caused Mrs. Sandoe's injury.

■ It is settled, absent en banc review by this court or legislative action, that there is only one standard of care for persons lawfully upon the landowner's or land occupier's property, and this is reasonable care under the circumstances. For the jury to be able to determine what level of behavior constitutes reasonable care under the circumstances, it is entitled to instructions that provide guidance on the various considerations to be taken into account in determining whether the general duty of reasonable care has been breached by the landowner. Thus, it is quite correct for the jury to be instructed, as here, that the landowner is liable for dangerous conditions that "are discoverable in the exercise of ordinary care." Furthermore, the issue of whether, in a particular situation, in order to discover dangerous conditions, the

11. Although the Sandoes did not specifically object to this elaboration, they did continue to request their proposed instruction.

12. The trial judge also distinguished these cases on factual grounds. The Sandoes presented the

trial judge with considerable authority to support their request for an instruction on a duty of inspection including the RESTATEMENT (SECOND) OF TORTS § 343 comment b (1965) and W. PROSSER, LAW OF TORTS § 61, at 393 (4th ed. 1971).

exercise of ordinary care encompassed a duty to conduct an inspection that would have uncovered the defect resulting in the plaintiff's injury is a legitimate subject for a trial court instruction as a factor that the jury must take into account. The concept of inspection by landowners and occupiers is one that has long been recognized and remains relevant as one of the considerations in determining whether a landowner or occupier exercises reasonable care under the circumstances. A landowner clearly must have some awareness of the condition of its property when asking people to enter onto it. To discover potential perils it necessarily follows that the landowner must inspect its property in some manner at some time and that the nature of the inspection is broad and expansive depending on the circumstances. *See Brown v. Racquet Club of Bricktown*, 95 N.J. 280, 291, 471 A.2d 25, 30 (1984) (proprietor absolved of liability for injury due to defective construction of stairway where condition found not to be discoverable by reasonable inspection); *District of Columbia v. Mitchell*, 533 A.2d 629, 639–41 (D.C.1987) (prison officials' duty of reasonable care includes a duty to inspect periodically ventilation covers to protect inmates against unreasonable risk of physical harm). Likewise the jury is entitled to instructions setting forth other appropriate considerations, such as the danger involved and the foreseeability of the harm. *See Arbaugh's, supra*, 152 U.S.App.D.C. at 94, 469 F.2d at 105. Consequently, while the determination of the appropriate level of care is no longer premised solely upon the classification of the entrant, the broad considerations underlying the classification scheme remain relevant to the issue of landowner/land occupier liability.[13]

Portions of the Sandoes' requested instruction referred to a "duty of inspection,"[14] while other portions addressed the

13. The historical background of the abolition of the common law distinctions sheds some light on why the classifications remain relevant to the jury's determination. In 1957 by Act of Parliament England did away with the common law distinctions between invitees and licensees. The Occupier's Liability Act of 1957, 5 & 6 Eliz. II, c. 31; *see Peterson v. Balach, supra* note 7, 199 N.W.2d at 645–46 & n. 1; *see also* HARPER AND JAMES § 27.1, at 132 & n. 16. Although the Act did not change the law in England governing liability to trespassers, it had the effect of improving the former position of the licensee since "a more positive duty is imposed on an occupier to prevent injury to all his lawful visitors...." *Peterson v. Balach, supra* note 7, 199 N.W.2d at 642–43 n. 1 (quoting Payne, *The Occupiers' Liability Act*, 21 MOD.L.REV. 359 (1958)). Those proposing the Act appeared to contemplate that the trier of fact would now be less inclined to infer an implied license. *Id.* Professor Prosser notes that encouragement for passage of the Act may have been affected by the fact that "the jury has virtually disappeared from negligence actions in England." *Id.* (quoting W. PROSSER, HANDBOOK OF THE LAW OF TORTS § 58 (3d ed. 1964)). Thus, after passage of the Act, the English judge's determination of liability, although no longer to be based on the single factor of the entrant's status, is still subject to a consideration of the legal consequences of the relationships between the entrant and the owner or occupier of land.

In this country, the courts that have abolished the common law categories have tended to emulate the English system by separating trespasser liability from liability to other entrants, so that the status of the entrant "continue[s] to have validity in determining such factors as foreseeability or expectations of the claimant." *Id.* (footnote omitted). This is even true for courts that have abandoned the classification system altogether. *Arbaugh's, supra*, 152 U.S.App.D.C. at 95, 469 F.2d at 106 ("Foreseeability of the visitor's presence determines in part the likelihood of injury to him, and the extent of the interest which must be sacrificed to avoid the risk of injury."). *See also, e.g., Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630, 79 S.Ct. 406, 409, 3 L.Ed.2d 550 (1959) (admiralty case); *Rowland v. Christian*, 69 Cal. 2d 108, 70 Cal.Rptr. 97, 443 P.2d 561 (1968); *see also* HARPER & JAMES, *supra* note 7, § 27.1, at 133 n. 18 (citing jurisdictions that have eliminated the status distinctions entirely). *But see* W. KEETON, D. DOBBS, R. KEETON & D. OWEN, PROSSER AND KEETON ON THE LAW OF TORTS § 62, at 433–34 (5th ed. 1984) (noting abrupt halt from 1979 to 1982 to abolition of common law categories as six courts rejected abolition, the courts having acquired "a healthy skepticism toward invitations to jettison years of developed jurisprudence in favor of a beguiling legal panacea.") [PROSSER & KEETON]. *See also* 62 AM.JUR.2D *Premises Liability* § 60, at 305 (1972).

14. For example:
You are further instructed that the defendant had a *duty to carry out such inspections* as a reasonable person would find necessary to detect or ascertain any dangerous conditions and a further duty to correct promptly any such dangerous conditions or to warn Mrs. Sandoe that they existed.

factors that are necessary for the jury's consideration and are erroneously omitted in the standardized jury instructions. For example, the Sandoes' proposed instruction stated, "If you find that the defendant failed to carry out a reasonable inspection program or plan from the time the building was completed until September 20, 1979, taking into consideration the *nature of the danger involved....*" (Emphasis added.) This portion of the requested instruction addressed the factor of the gravity of the harm, one of the factors about which the jury is required to be instructed. Similarly, the Sandoes' proposed instructions asked the jury to consider "the nature of the building as a hotel, the age of the building, the various providers of services who enter and use the premises and similar factors." This portion of the requested instruction, although without using the precise terms, clearly refers to the probability or foreseeability of the harm, another of the factors about which the jury must be informed.

■ Nor was the Sandoes' requested instruction objectionable simply because it referred to a duty of inspection. Before the distinction between invitees and licensees was eliminated, a landowner's duty to inspect the premises for dangerous conditions was the "most prominent difference between the rights of invitees and those of licensees." HARPER & JAMES, *supra* note 7, § 27.12, at 234.[15] Because "a man's life or limb does not become less worthy of protection or compensation because he has come upon the land for social rather than for business purposes," *De Gildo v. Caponi*, 18 Ohio St.2d 125, 131, 247 N.E.2d 732, 736 (1969), the distinction between invitees and licensees has been extinguished and the position of licensees raised to the level of protection once reserved for invitees. Rather than jettisoning years of developed jurisprudence, *see* PROSSER & KEETON, *supra* note 13, § 62, at 433–34, case law in this jurisdiction and other authority that defined the scope of the duty of care formally reserved for invitees remains relevant to define the scope of the duty of care applicable to all persons lawfully upon the premises. Thus, the landowner's duty of reasonable care to persons lawfully upon the premises includes a duty to inspect the premises for latent, dangerous defects.[16]

■ The question for the jury was whether Lefta had breached its duty to Mrs. Sandoe to exercise reasonable care to be sufficiently aware of potential perils in the condition of the hotel property in view of Lefta's employment of Mrs. Sandoe to eliminate a rat infestation problem. Although evidence was offered that Lefta had not conducted an inspection of the property in the eleven years of its possession preceding Mrs. Sandoe's injury, that did not entitle the Sandoes to a directed

(Emphasis added.)

**15.** *See* J. Page, THE LAW OF PREMISES LIABILITY § 4.6, at 77 (2d ed. 1988) ("Unlike the licensee, the invitee is entitled to expect that the owner has inspected the premises for dangerous conditions.") and § 4.8, at 86 ("the possessor has an affirmative duty to an invitee to inspect his premises and seek out conditions that may involve an unreasonable risk of harm to the invitee").

**16.** *Mitchell, supra,* 533 A.2d at 639–41 (duty of reasonable care includes a duty to inspect); *Arbaugh's, supra,* 152 U.S.App.D.C. at 95 n. 48, 469 F.2d at 106 n. 48 ("obligation of due care extends to reasonable supervision and inspection of the premises" (citation omitted)); *Seganish, supra,* 132 U.S.App.D.C. at 119–20, 406 F.2d at 655–56 ("obligation of due care extends to reasonable supervision and inspection of the premises to identify and protect against potential perils"); *Hellyer, supra,* 62 U.S.App.D.C. at 318, 67 F.2d at 584 (ordinary care included a duty of inspection); *see* PROSSER & KEETON, *supra* note 13, § 61, at 419 (duty of care includes "an affirmative duty to protect [lawful visitors], not only against dangers of which he [or she] knows, but also against those with which reasonable care he [or she] might discover"); HARPER & JAMES, *supra* note 7, § 27.12, at 234–35 ("duty of reasonable inspection is only part of a larger duty of reasonable care to make the premises reasonably safe"); RESTATEMENT (SECOND) OF TORTS, *supra* note 12, § 343 comment b, at 216 (duty of care includes affirmative obligation to perform an "inspection to discover [the premises'] actual condition and any latent defects"); *see also Thompson–Weinman & Co. v. J.E. Brock,* 144 Ga.App. 346, 347–50, 241 S.E.2d 279, 281–82 (1977); *Brown v. Racquet Club of Bricktown, supra,* 95 N.J. at 290, 471 A.2d at 30 (quoting RESTATEMENT (SECOND) OF TORTS § 343 comment (b), at 216); *Meyer v. State,* 92 Misc.2d 996, 1000, 403 N.Y.S.2d 420, 424 (1978) (adopting *Arbaugh's*).

verdict. A jury could reasonably find that the nature of the defective condition of the grate was of such subtle character as to be discoverable only by an extraordinary investigation beyond the requirements of reasonable care under the particular circumstances. *See, e.g., Brown v. Racquet Club of Bricktown, supra,* 95 N.J. at 291, 471 A.2d at 30 (character and duration of defect determine whether reasonable opportunity existed to discover it).[17] The resolution of this issue requires the jury to weigh the factors which ordinarily govern negligence actions: "the likelihood that [the landowner's] conduct will injure others, taken with the seriousness of the injury if it happens, and balanced against the interest which [the landowner] must sacrifice to avoid the risk." *Arbaugh's, supra,* 152 U.S.App.D.C. at 94–95, 469 F.2d at 105–106 (quoting *Conway v. O'Brien,* 111 F.2d 611, 612 (2d Cir.1940) (L. Hand, J.)); *see Peterson v. Balach, supra* note 7, 199 N.W.2d at 648 n. 7 (relevant factors for the jury to consider include "the circumstances under which the entrant enters the land (licensee or invitee); foreseeability or possibility of harm; duty to inspect, repair, or warn; reasonableness of inspection or repair; and opportunity and ease of repair or correction").

By refusing to incorporate the portions of the Sandoes' requested instruction on the relevant factors in the charge to the jury, the trial judge failed to provide the jury with sufficient guidance in its determination of what land owner behavior constituted reasonable care under the circumstances of this case. Therefore, the instruction was deficient. *Wingfield v. Peoples Drug Stores, Inc.,* 379 A.2d 685, 688–89 (D.C.1977); *Reese v. Wells,* 73 A.2d 899,

902 (D.C.1950). That the Sandoes were permitted to argue to the jury that the exercise of reasonable care required Lefta periodically to inspect the grates does not cure the error since the trial judge has the obligation to inform the jury of the relevant legal principles to be applied in its deliberations.

Accordingly, we reverse and remand for a new trial.

*AFFIRMED IN PART; REVERSED IN PART.*

STEADMAN, Associate Judge, concurring:

In the District of Columbia, unlike the rule at common law still in effect in the majority of American states, the normal ordinary negligence standard applies to occupiers of land:[1] reasonable care under all the circumstances. Today, as I understand it, the majority holds that this standard encompasses in all cases (other than with respect to trespassers) an affirmative duty to "inspect" the premises. I think this is too sweeping a formulation.

The word "inspect", even when coupled with the modifier "reasonable", carries a rather powerful charge. It has been defined in ordinary American usage, as "1: to view closely and critically (as in order to ascertain quality or state, detect errors, or otherwise appraise); examine with care; scrutinize. 2: to view and examine officially (as troops or arms)." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 1170 (1981). There presumably are situations and categories where the duty of a land occupier fairly includes such a concept, and indeed,

---

**17.** Contrary to the suggestion in the concurring opinion, our holding does not incorporate any of the particular burdens sometimes associated with the term "inspection," but rather leaves the decision about the nature and scope of the landowner's duty to perform a reasonable inspection to the trier-of-fact under the circumstances of each case. *See* BLACK'S LAW DICTIONARY 716 (5th ed. 1979) (defining the term "inspect" as "to examine; scrutinize; investigate; look into; check over; or view for the purpose of ascertaining the quality, authenticity or conditions of an item...."); *cf. Central Nat'l Bank v. Fleetwood Realty Corp.,* 110 Ill.App.3d 169, 175, 65

Ill.Dec. 730, 735, 441 N.E.2d 1244, 1249 (1982) ("the word 'inspection' ... has a broader meaning than just viewing. It has been defined to include 'examine carefully or critically, investigate and test officially, especially a critical investigation or scrutiny'") (citation omitted).

**1.** The duty of care extends beyond landowners to all occupiers, whether the feeholder, tenant or otherwise. *See* PROSSER ON TORTS 386 (5th ed. 1984). THE RESTATEMENT (SECOND) OF TORTS § 328 E (1965) uses the phrase "possessor of land."

as the majority points out, the expression has been applied, I think in somewhat a loose way, to the common-law duty owed to an invitee as opposed to a licensee. However, in my view, the correct standard (and one less apt to be misinterpreted by a jury) is generally better expressed simply in the phraseology used by the Restatement in its black-letter text; *viz.*, that a possessor of land is subject to liability if, but only if, he or she "knows or by the exercise of reasonable care would discover the [dangerous] condition," RESTATEMENT (SECOND) OF TORTS § 343(a) (1965), or, in the words of the old Standardized Civil Jury Instruction applicable to invitees, that the possessor is liable for dangerous conditions which "are discoverable in the exercise of ordinary care." Standardized Civil Jury Instructions for the District of Columbia, No. 10–5 (1981).[2]

The latter is precisely the wording used in the revised Standardized Civil Jury Instructions, No. 10–3 (1985 Supp.) and incorporated in the trial court's charge here. Furthermore, appellant had full opportunity to argue to the jury that that standard as applied here included a duty to inspect. What might be appropriate under the circumstances of this case would be an instruction including, as a factor for jury consideration, the possibility that the duty of care encompassed a duty to inspect in its ordinary meaning, a matter I would leave for the trial court to consider.[3]

I fully concur in parts I and II of the majority opinion.

---

2. The former instruction applicable to invitees included the sentence that "the owner or occupier is not bound to discover defects which a reasonable inspection would not disclose." Carefully read, however, this sentence expressed an outside limitation on the duty of care and did not state the converse majority holding here.

3. I do not address the issue whether the requested instructions in this case were sufficient, under my view of the applicable standard, to warrant reversal. *Cf. District of Columbia v. Mitchell*, 533 A.2d 629, 645–46 (D.C.1987).